CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

**MAY 0 4 2012**

JULIA C. DUDLEY, CLERK
BY: _/s/ Bright_
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ROGER BARBER,                                    )
ERIC GODFREY,                                    )
EDDIE SIMMONS, JR.,                              )
and                                              )
RYAN YOUNG,                                      )     Civil Action No. 7:09-cv-00441
                                                 )
        Plaintiffs,                              )
                                                 )     **MEMORANDUM OPINION**
v.                                               )
                                                 )
JTEKT AUTOMOTIVE VIRGINIA, INC.                  )
and                                              )     By: Hon. Glen E. Conrad
JTEKT NORTH AMERICA, INC.,                       )     Chief United States District Judge
                                                 )
        Defendants.                              )

This case involves hostile work environment, racial discrimination, and unlawful

retaliation claims brought by four black males against their previous employer under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and 42 U.S.C. § 1981. The case is

presently before the court on the defendants' motion for summary judgment. For the reasons set

forth below, the court will grant in part and deny in part the defendants' motion.

I.      **Factual and Procedural Background**[1]

        The plaintiffs in this case were, at the times relevant to this lawsuit, employed by JTEKT

Automotive Virginia, Inc. ("JTEKT"), in Daleville, Virginia.[2] Plaintiff Roger Barber ("Barber"),

a black male, was hired by JTEKT in August 2004. Plaintiff Eric Godfrey ("Godfrey"), a black

male, was hired by JTEKT in July 2005. Plaintiff Ryan Young ("Young"), a black male, was

hired by JTEKT in August 2005 and, after quitting in September 2006, was rehired by JTEKT in

---

[1]     The court presents the facts in the light most favorable to the plaintiffs, the nonmoving party. Terry's Floor
Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).
[2]     Prior to its closing in 2010, JTEKT was one of the manufacturing locations for JTEKT North America,
Inc., which is also a defendant in this case.

September 2007.  Plaintiff Eddie Simmons, Jr. ("Simmons"), a black male, was hired by JTEKT in March 2008.

**A.      Facts underlying hostile work environment claims**

At the heart of the plaintiffs' lawsuit is their allegation that a culture of racial harassment and discrimination permeated JTEKT's work environment during their employment with the company.

**1.      Barber**

According to Barber's deposition testimony, JTEKT employees from a facility in Japan—both "head guys" and members of the "support crew"—referred several times to Gladimyr Balisage ("Balisage"), another black employee, as a "monkey."[3]  (Docket No. 94-37 at 91–103.)  However, according to Barber, the "monkey" epithets "faded away" after Barber asked the Japanese employees to stop and after he reported the issue to his line supervisor.[4]  (Id. at 93–96.)  Barber conceded in his deposition that he did not report the racial slurs to JTEKT's human resources department at the time that they occurred—instead, the first time that Barber broached the topic of harassment or discrimination with JTEKT management was on April 21, 2009.  (Id. at 94, 98; Docket No. 92-23, Ex. 117.)  Furthermore, Barber testified in his deposition that he personally had not been the brunt of any racially charged harassment during his employment with JTEKT.  (Docket No. 94-37 at 100.)

---

[3]      These allegations by Barber (and by the other plaintiffs, as described infra) are corroborated by the deposition testimony of Yoshi Hashiwada ("Hashiwada"), a production manager at a JTEKT manufacturing facility in Nara, Japan.  For several years, most recently in 2009, Hashiwada travelled to the JTEKT plant in Daleville, Virginia to instruct the workers in production methods.  (Docket No. 94-31 at 6.)  During Hashiwada's visits, he would refer to the black employees as "monkeys," explaining that he did so because "everyone was using the term." (Id. at 9.)  Hashiwada affirmed that he had not been disciplined by JTEKT for his use of the term "monkey."  (Id. at 10.)

[4]      Likewise, the court notes that Balisage testified in his deposition that the racial slurs ceased after he reported the situation to the human resources department.  (Docket No. 94-24 at 200–01.)

2

## 2.   Godfrey

Godfrey's deposition testimony revealed some of the same incidents that Barber addressed in his deposition. Godfrey testified that JTEKT managers from a facility in Japan visited the Daleville plant and laughingly referred to black workers as "monkeys." (Docket No. 94-29 at 143.) Furthermore, Godfrey stated that a Vietnamese team leader named Phuoc Le ("Le") referred to Balisage as a "monkey." (Id. at 115.) Godfrey also stated that Le told him that he would never be a team leader because "JTEKT don't think black men make good team leaders." (Id. at 117.) However, Le's harassing behavior did not stop at merely words. Instead, in September 2008, Godfrey witnessed Le "maliciously t[ake] duct tape and wrap[] it around [Balisage]'s face." (Id. at 48.)

At one point in his deposition, Godfrey articulated generalized assertions that he had "been telling [JTEKT] about Le for years." (Id. at 65, 71.) However, later in his deposition, he conceded that he did not report the "Balisage taping incident" to JTEKT's human resources department (id. at 116) and, furthermore, that he did not report any harassment-related concerns to JTEKT management until an interview with JTEKT officials on April 22, 2009. (Id. at 111; Docket No. 92-21, Ex. 71.) In fact, Godfrey explained that the reason that he had never previously reported any racial concerns to the human resources department was that he "was scared of [his] job and . . . didn't want to make it public that [he] knew things." (Docket No. 94-29 at 111.) Godfrey also testified that, if he had reported the harassment, the human resources department would have "told [CJ Bowers ("Bowers"), a supervisor at JTEKT], [and then] it would have made it harder for me."[5] (Id. at 104.) Furthermore, apart from Le's comment concerning JTEKT's alleged sentiments towards black team leaders, Godfrey affirmed that no "racist terms" were ever directed toward him personally. (Id. at 110.)

---

[5]   The court notes that Bowers was having a flirtatious, and later sexual, relationship with JTEKT plant manager Ken Morrow. (Docket No. 94-25 at 15; Docket No. 94-26 at 5–6; Docket No. 94-34 at 32.)

### 3.    Simmons

Similar to the testimony of Barber and Godfrey, Simmons' deposition testimony also focused on the allegedly harassing behavior that was directed toward Balisage.  Simmons observed that Le frequently referred to Balisage as a "monkey." (Docket No. 94-28 at 71.) Furthermore, Simmons mentioned a certain photograph of Balisage, containing Japanese writing, that was circulated around the JTEKT plant.  When Simmons questioned a Japanese manager concerning the meaning of the writing, the manager responded that the writing represented the word "monkey." (Id. at 43.) Simmons asserted that the photograph produced by the defendants in discovery is not the photograph that Simmons saw at the plant.[6] (Id.)  However, Balisage affirmed in his deposition that the photograph produced by the defendants in discovery was the photograph in question.[7] (Docket No. 94-24 at 238–39.)

Simmons also testified concerning the Balisage taping incident in September 2008—according to Simmons, Le wrapped tape around Balisage's face, neck, and chest.  (Id. at 29.) When Simmons asked Le why he had taped up Balisage, Le laughingly responded, "Well, he is a monkey." (Id.)  While Balisage was still taped up, Simmons escorted him to the human resources department where they spoke with Wanda Hylton.  (Id. at 29–30.)  Simmons stated:

> So I tell Wanda that Lee [sic] takes the tape, straps it around Gladimyr's head, around his body, and I said something needs to be done about that.  And plus called monkey, whatever.
>     And then she turns around, takes her hand, takes the tape off Gladimyr's head, around his body, pats him on the back and said, Well, everybody plays.  I'll take care of it.  And pushes Gladimyr out the door.

(Id. at 30.)  Simmons asserted that, instead of suspending or disciplining Le, Hylton sent Le back to the production line, where he laughed about the incident for three days before he was

---

[6]    The photograph produced in discovery represents a demonstration on the proper use of equipment and contains Japanese and English terms describing the operation of the equipment. (Docket No. 92-20, Exs. 50, 172.)
[7]    The court notes that, according to Balisage, he requested to be in the photograph and, in fact, that he "like[s] posing for picture[s]." (Docket No. 94-24 at 240–41.)  Furthermore, Balisage stated that he was not upset regarding the photograph after the Japanese writing was translated into English for him. (Id. at 239.)

4

terminated by JTEKT.  (Id. at 40.)  However, the defendants point to the declaration of Don Knight, JTEKT's Senior General Manager of Employee Relations, who stated that "Le immediately was suspended pending an investigation into the matter and was terminated less than forty-eight (48) hours after the incident."  (Docket No. 92-8 at ¶ 8.)

According to Simmons, the racially harassing atmosphere at JTEKT affected more employees than just Balisage.  Le and another Vietnamese employee named Phillip Huynh ("Huynh") habitually utilized the term "blacky" to refer to black employees.  (Docket No. 94-28 at 63.)  Furthermore, Simmons testified that he heard a white female employee say, "We don't need to do anything.  Let the blackys do it."  (Id. at 69.)

Simmons also testified that racially harassing behavior was directed personally at him. According to Simmons, Huynh called Simmons names such as "nigger," "monkey," "blacky," and "boy."  (Id. at 57.)  After Simmons reported the harassment to Ed Bradley, JTEKT's human resources manager at the time, Bradley simply pulled Huynh off of the production line and spoke to him briefly.  (Id. at 58.)  The name-calling resumed about two weeks later, Simmons testified. (Id.)  However, the record contains no evidence suggesting that the resumptive name-calling was ever reported to the human resources department.  Tanya Nicely ("Nicely"), a white production worker, substantiated Simmons' claims, testifying that Huynh "used the N word with . . . Simmons . . . . about every day, every hour."  (Docket No. 94-35 at 39.)  Nicely testified that she reported Huynh's incessant name-calling of Simmons to Bowers, but that Bowers summarily dismissed Nicely's complaint, telling Nicely "not to worry about it, that's just how [Huynh] is." (Id. at 63.)  However, Nicely stated that, after Simmons reported the issue to Bradley, Bradley "came right out" and "stopped" the name-calling.  (Id. at 40.)

The defendants take issue with Simmons' testimony concerning the harassing behavior that allegedly was directed at him personally.  Initially, the defendant's point to Bradley's

deposition testimony, in which Bradley stated that, after he spoke with Huynh concerning Simmons' report of name-calling, Bradley reported back to Simmmons, who said that he was "satisfied" with how Bradley had handled the situation. (Docket No. 94-27 at 63.) Additionally, the record demonstrates that, when JTEKT officials first interviewed Simmons on April 21, 2009, Simmons mentioned nothing about Huynh or any other employee referring to him as a "nigger" or as a "monkey." (Docket No. 92-24, Ex. 133.) More specifically, Simmons did not expressly state that any derogatory terms had been directed at him personally. Simmons also stated during the April 21 interview that the name-calling ceased after Bradley confronted Huynh —in fact, Simmons praised Bradley by stating that "[y]ou can tell [Bradley]'s presence is here." (Id.) Simmons' deposition represents the first time that he alleged that any racial epithets had been directed at him personally, that Huynh had used the terms "nigger" and "monkey," and that the name-calling persisted after Bradley spoke with Huynh. The defendants also assert that, after his April 21 interview, Simmons contacted the human resources department and the anonymous helpline for unrelated reasons, but did not report that the name-calling had resumed.

### 4. Young

Like his other three co-plaintiffs, Young also testified that a large amount of racial animus in the JTEKT plant was directed toward Balisage. In his deposition, Young stated that technicians from Japan visited the JTEKT plant in Daleville and called Balisage a "monkey." (Docket No. 94-38 at 211–13.) Young also spoke of a photograph of Balisage on which someone had written the word "monkey." (Id. at 209.) However, like Simmons, Young asserted that the photograph produced in discovery by the defendants is not the photograph to which he was referring. (Id.)

Young testified in his deposition that racial harassment was also directed at him and at other black employees. According to Young, the Japanese technicians referred to him and other

6

black employees as "gangsters" and "Mafia members."[8] (Id. at 212.) Young also stated that Le

told him on one occasion that "black people don't make good team leaders." (Id. at 196.)

According to Young, JTEKT management refused to acknowledge Barber as a team leader,

stating, for example, that the board in an office that listed all of the team leaders listed Barber as

a basic production worker when, in fact, Barber was a team leader. (Id. at 173.) Young also

mentioned that he had seen racial graffiti in the bathrooms at the plant, including the word

"nigger." (Id. at 188.) However, Young acknowledged that racial graffiti in the bathrooms

would be periodically "scratched out." (Id.) According to Young, he suffered personally from

racially harassing behavior through the actions of Bowers, his supervisor. Bowers was

"basically a racist," Young testified. (Id. at 44.) However, to substantiate this generalized

assertion, Young stated only that Bowers would ignore him, treat him differently than the other

employees, and fail to train him properly. (Id. at 44–47.) Young acknowledged in his deposition

that he had never reported any concerns to the human resources department or to management,

and had never utilized the anonymous helpline, asserting that, if he had so reported his concerns,

he felt that he would have lost his job and that his concerns would have fallen on deaf ears. (Id.

at 190, 208–09.)

### 5.   Testimony of other witnesses concerning the allegedly hostile work environment

The plaintiffs also submit in the record the sworn declaration of Mickey Allen Campbell,

a black JTEKT employee who was terminated in August 2008. According to Campbell,

"numerous workers and members of management us[ed] inappropriate racist language including

the word 'nigger,' without reprimand." (Docket No. 94-4 at ¶ 2.) Campbell asserted that, on two

occasions, she reported the use of the word "nigger" to Wilkinson, the then-human resources

---

[8]      The defendants point out that Young mentioned the "gangster" and "Mafia" references for the first time in his deposition—he made no mention of these slurs in his sworn charges filed with the Equal Employment Opportunity Commission, the complaint, or the amended complaint.

manager, but, to Campbell's knowledge, Wilkinson took no corrective action against the perpetrators. (Id. at ¶ 3.) Furthermore, Campbell stated that Jeff Robbins, a production engineer manager with whom Campbell worked closely, often employed racist language and jokes. (Id. at ¶ 4.)

The plaintiffs also submit the sworn declaration of Howard Dowe, a black JTEKT employee who was hired in February 2008 after previously working at JTEKT on a temporary basis. After JTEKT offered Dowe full-time employment, Dowe was informed that he would have to sign a document stating that he "had to work Sundays to get the job." (Docket No. 94-17 at ¶ 3.) Dowe signed the document because he needed the job; however, Dowe stated, other white and Muslim employees were not required to sign a document obliging them to work on their Sabbath day. (Id.) Furthermore, after suffering a work-related injury to his neck and back, Dowe's doctor authorized him to work "light duty." (Id. at ¶¶ 4–5.) However, a JTEKT representative informed Dowe that the company had no light duty for him. (Id. at ¶ 5.) Dowe considered this odd because "the company permitted caucasian employees who were hurt on the job to work light duty." (Id.)

The plaintiffs also submit the sworn declaration of Dwayne Wilson, a JTEKT employee who resigned in May 2006. Wilson stated that Bowers, one of the plant managers, "hired white males and then promoted them over employees who had been there a while, particularly blacks and other minorities." (Docket No. 94-18 at ¶ 5.) Another manager informed Wilson that JTEKT was going to train him to be a team leader; however, when Bowers learned of this, Wilson stated, she "promoted one of the white guys instead." (Id. at ¶ 6.) According to Wilson, Bowers stated that "she had rather have a white guy in charge." (Id. at ¶ 7.) Wilson asserted that he attempted to file a complaint with the union, but that one of the "head men" informed him that he should drop the complaint or else he "didn't have a job." (Id. at ¶ 8.)

8

The sworn declaration of Shawn Craighead, a white JTEKT employee, is also submitted by the plaintiffs. According to Craighead, he became aware that JTEKT maintained unmarked binders that contained application materials from when the plant was first opened in 2002. (Docket No. 94-19 at ¶¶ 3–4.) Craighead stated that an official from Japan made the hiring decisions and often made entries in Japanese on the application, specifically noting whether the applicants were black or white. (Id. at ¶¶ 5–6.) According to Craighead, the Japanese official utilized the word "Orangeburg" as code for identifying whether an applicant was black. (Id. at 6.) Craighead explained that, at that time, JTEKT owned a plant in Orangeburg, South Carolina, that was staffed primarily with black employees. (Id.)

The plaintiffs also submit the sworn declaration of Shawn Hunter, a black JTEKT employee. According to Hunter, JTEKT management fostered a practice of removing black employees from their positions and, without reason, reassigning them to more physically demanding positions at the Daleville plant. (Docket No. 94-22 at ¶ 3.) Around March 2009, Hunter was moved from his position on the train line to the parts yard, which, according to Hunter, was the most physically demanding department at the plant. (Id. at ¶ 4.) Hunter asserted that he was given no reason for the transfer and that he was replaced on the train line by a white employee who was taken out of the parts yard. (Id.) The defendants present evidence suggesting that Hunter's reassignment was not a demotion in that it did not involve a reduction of pay or benefits. (Docket No. 92-8 at ¶ 32.) Furthermore, the defendants point to evidence indicating that, after Hunter complained about the reassignment, Bradley investigated the matter and disciplined the supervisor who authorized the reassignment for his failure to properly notify Hunter of the reasons behind the transfer. (Docket No. 94-27 at 73–74.) Bradley then offered Hunter a reassignment back to his previous position, but Hunter responded, "I'm fine here, just leave me here." (Id. at 74.)

9

### 6.     Other evidence in the record

Several days after the Balisage taping incident, JTEKT effectively overhauled its management in several key areas of the plant.  As part of this overhaul, JTEKT officials forced Linda Wilkinson, the then-human resources manager, to resign.  (Docket No. 94-39 at 11.)  In the meeting in which JTEKT officials informed Wilkinson of their decision, Wilkinson was presented with a letter that provided, in pertinent part:

> These challenges include . . . our ability to stabilize the workforce due to relationship issues with employees and continued high employee turnover
> We have concluded that we must change our culture and performance, with both being changed substantially and quickly.  Otherwise, our relationship with employees, Toyota, and the future development of our business are at risk.
> After considering the matter very carefully, we have decided that we must bring in new and different management in certain key areas of the plant.  I am sorry to say that your area is one of those, and we will be bringing in a new human resources manager.

(Docket No. 94-13.)  At the time of the meeting, Wilkinson was unaware of the Balisage taping incident and, furthermore, was unaware of any complaints of racial harassment or discrimination at the plant during her tenure.  (Docket No. 94-39 at 18–19, 32–33.)  JTEKT replaced Wilkinson with Bradley.  (Docket No. 94-27 at 9–10.)

Thereafter, in January 2009, JTEKT conducted a mandatory diversity training in which the company reviewed with employees its equal employment opportunity and harassment policies.[9]  At the training, employees were encouraged to contact the human resources

---

[9]     JTEKT's equal employment opportunity and harassment polices provided, in pertinent part:

2.1  Equal Employment Opportunity Policy

JTEKT is an equal opportunity employer.  We are committed to maintaining a workplace free from prohibited employment conduct, including discrimination or harassment on the basis of any class protected by law; [and] retaliation for engaging in protected activity . . . .

2.1.1  Employment Discrimination

The Company is committed to maintaining a workplace free of discrimination on the basis of any protected class, including race, color, national origin, . . . (hereinafter called "Protected Characteristics") . . . .

10

department or other managers with any harassment or discrimination concerns. Employees were also reminded that, in early 2008, JTEKT had established a helpline through which employees could anonymously report concerns to a third-party service.

Then, in late March 2009, a black employee named Jason Woolfolk reported to JTEKT plant manager Ken Morrow that he had been receiving anonymous "hate" notes and nooses at his desk. (Docket No. 94-34 at 14–15; Docket No. 94-27 at 23; Docket No. 92-8 at ¶ 11.) Furthermore, Woolfolk reported that he had been "[c]alled a Nigger by one of the company's top engineers in front of 10 other employees at a celebration of my promotion." (Docket No. 94-2 at 1.) After receiving this report, JTEKT immediately launched an investigation, in which

---

1.1.1 [sic] Harassment

    The Company will not tolerate harassment based on any Protected Characteristic, and will take appropriate measures to prevent and/or stop any such harassment. Harassment is broadly defined as any conduct, whether verbal or physical, that denigrates, insults or offends a person or group on the basis of a Protected Characteristic where:
    (1) submission to such conduct is made an explicit or implicit term of employment;
    (2) submission to or rejection of such conduct is used as a basis for any adverse employment decision; or
    (3) such conduct had the purpose or effect of interfering with an employee's work performance or creating an intimidating, offensive or hostile working environment.

(Docket No. 92-18, Ex. 11.)
JTEKT's Employee Handbook also provided a complaint procedure:

    If you are aware of any conduct that may violate this policy, please contact the Human Resources Department immediately . . . to inform the Company of the complaint. Appropriate steps will be taken to investigate the claim and notify you of a resolution. JTEKT will not tolerate retaliation against an employee who makes a report under this policy or who participates in any investigation of a complaint . . . .
    All reports will be referred to Human Resources for investigation, review or other appropriate action. Human resources will conduct a prompt, thorough investigation to determine what has taken place. All facts concerning any report will be kept confidential . . . . If JTEKT concludes this policy has been violated, it will take prompt corrective action reasonably designed to end the violation and to prevent any further violations from occurring. Such corrective action may include disciplinary action against anyone found to have violated this policy, up to and including immediate termination of employment.

(Id.) At the time of their hiring, each of the plaintiffs signed acknowledgements certifying their receipt and understanding of these policies. (Docket No. 94-37 at 23–27; Docket No. 94-29 at 30–31; Docket No. 94-28 at 21–23; Docket No. 94-38 at 60–64.)

company officials conducted wall-to-wall interviews of all employees,[10] scheduled additional

mandatory diversity training, and initiated the process of updating, republishing, and circulating

the company's equal employment opportunity and harassment policies. (Docket No. 92-8, Ex.

B.)  In addition to initiating its own internal investigation, JTEKT enlisted the aid of the

Botetourt County Sheriff's Department ("Sheriff's Office") to investigate Woolfolk's

allegations.  (Id.; Docket No. 94-27 at 27.)  However, Woolfolk proved largely uncooperative as

the Sheriff's Office attempted to interview him in relation to his allegations.[11]  (Docket No. 92-8,

Ex. B; Docket No. 94-33 at 87.)  Thereafter, on April 22, 2009, JTEKT and Woolfolk agreed to

settle his claim and, on May 1, 2009, the parties executed the settlement agreement.  (Docket No.

92-8 at ¶¶ 19–21.)

On May 1, the same day that JTEKT and Woolfolk executed the settlement agreement,

Balisage reported to his team leader that he had received a "hate" note.[12]  (Docket No. 92-8 at ¶

22; Docket No. 92-24, Ex. 134.)  Again, JTEKT immediately contacted the Sheriff's Office and

arranged for Balisage and other witnesses to be interviewed.  (Docket No. 92-8 at ¶ 23; Docket

No. 92-27, Ex. 186.)  Then, on May 7,[13] Nicely found a "hate" note in her locker.  (Docket No.

92-8 at ¶ 24; Docket No. 92-24, Ex. 136.)  JTEKT again contacted the authorities for their

assistance.  After an extensive investigation, Balisage was arrested and later confessed to

---

[10]    These interviews unearthed a number of issues that, according to the defendants, had occurred many
months beforehand and had not been previously reported.  (Docket No. 92-8 at ¶ 28.)  Not only did the plaintiffs
report during these interviews the general culture of racial harassment that allegedly permeated JTEKT, but Barber,
Godfrey, and Young reported during the interviews that they had been the victims of discrimination in the form of
various adverse employment actions.  The specific facts underlying these individual claims of racial discrimination
will be discussed infra.  All four of the plaintiffs filed charges with the Equal Employment Opportunity Commission
before instituting the instant suit.  (Docket No. 92-22, Ex. 77; Docket Nos. 94-8, 94-9, 94-23.)
[11]    Eventually, both JTEKT management and the Sheriff's Office developed doubts regarding the veracity of
Woolfolk's claims.  (Docket No. 94-27 at 42–43.)
[12]    As of May 1, 2009, JTEKT was continuing to respond to the Woolfolk incident, by working with law
enforcement authorities, interviewing all employees, and republishing and scheduling training its equal employment
opportunity and harassment policies, and republishing its equal employment opportunity.  Furthermore, JTEKT had
posted a $2,500 reward for anyone who furnished the company with information concerning the identity of the
culprit behind the Woolfolk incident.  (Docket No. 92-20, Ex. 49.)
[13]    May 7, 2009, was the day that JTEKT held its mandatory training regarding its harassment and
discrimination policies in the wake of the Woolfolk incident.

authoring the May 1 and May 7 notes. (Docket No. 92-26, Ex. 166.) On November 18, 2010, Balisage pled guilty in Botetourt County Circuit Court to attempting to obtain money by false pretenses. At the time of Balisage's guilty plea, both Godfrey and Simmons were present in the gallery and allegedly threatened Balisage. (Docket No. 94-24 at 166–74.) However, both Godfrey and Simmons deny this allegation. (Docket No. 94-29 at 182–84; Docket No. 94-28 at 216–17.) Thereafter, Balisage was sentenced to a term of incarceration to be followed by a term of probation. Balisage was released from incarceration on May 11, 2011, and was then picked up by the Immigration and Naturalization Service, which held Balisage at a detention facility. (Docket No. 94-24 at 20–22.) On August 1, 2011, Balisage appeared again before the Circuit Court of Botetourt County on a motion to modify his sentence. During the hearing, Balisage implicated Simmons as the mastermind behind the "hate" notes scheme[14]—an allegation that Simmons denies. (Docket No. 94-16; Docket No. 94-28 at 214–16.) At the conclusion of the hearing, the court terminated Balisage's probation. (Docket No. 94-16.)

## B.    Facts underlying racial discrimination claims

Apart from the plaintiffs' allegations regarding a general culture of racial harassment, three of the plaintiffs claim that JTEKT took racially discriminatory adverse employment actions against them.

### 1.    Barber

Barber testified in his deposition that JTEKT discriminated against him by denying him certain promotions and by unfairly demoting him. With respect to the denial of promotion claims, Barber alleged in the complaint that, contrary to company policy, JTEKT failed to post various job openings and, instead, handpicked employees, generally white employees, to fill the openings. (Docket No. 21 at ¶ 12.) In his deposition, Barber failed to identify any specific

---

[14]    Prior to this allegation, Balisage had maintained consistently that he alone had acted as the architect of the notes scheme. (Docket No. 94-24.)

position that he lost through the handpicking system.  Instead, he testified that, while he observed this handpicking practice affect other people, it did not affect him personally.  (Docket No. 94-37 at 87.)

With respect to his unfair demotion claim, Barber testified that he was demoted from the position of Team Leader of the AD Line to the production control department.  According to Barber, he received no training after he was promoted to team leader and, therefore, reached out to JTEKT management to secure such training.  (Id. at 54–55, 61–65.)  However, JTEKT management failed to give him the training he sought and, in fact, gave him conflicting orders concerning his job responsibilities.  (Id. at 63.)  After several months of not receiving the training that he needed, Barber was demoted and replaced by a white female.  (Id. at 66–69.)  The defendants point to evidence in the record suggesting that Barber was demoted due to substandard job performance.  (Id. at 50, 55–56. 58, 60–61, 63–64.)

### 2.    Godfrey

Godfrey testified in his deposition that JTEKT discriminated against him by denying him certain promotions.  According to Godfrey, he applied for a number of team leader positions during his tenure with the company.  (Docket No. 94-29 at 94, 139.)  JTEKT management interviewed Godfrey for the positions and told him that "[he] gave the best interview and more than likely [he] had a team leader position."  (Id. at 139.)  JTEKT management also informed Godfrey that the hiring decisions would be made based on seniority.  (Id. at 148.)  However, despite Godfrey's seniority, JTEKT gave the team leader positions to white employees.  (Id. at 47.)  Thereafter, Godfrey applied for a backup team leader position which was filled by a white employee over whom Godfrey had seniority.  (Id. at 147–48.)

The defendants point to evidence in the record suggesting that one of the team leader positions for which Godfrey applied was given to Barber, his co-plaintiff.  (Docket No. 92-22,

14

Ex. 105.)  The defendants further state that Godfrey was not hired for the positions in question

due to his lack of maintenance experience.  (Docket No. 94-36 at 52.)  The defendants also assert

that JTEKT offered Godfrey a team leader position on the second shift, but that Godfrey declined

the position due to family responsibilities.  (Docket No. 94-34 at 39–40.)  Additionally, the

defendants point to the portion of the record that shows that a facilities technician position was

created specifically for Godfrey and given to him with a raise.  (Docket No. 94-36 at 52; Docket

No. 94-29 at 73.)  However, Godfrey asserted in his deposition that this promotion involved a

less desirable position.  (Docket No. 94-29 at 142.)

### 3.    Young

Young testified at his deposition that JTEKT discriminated against him by forcing him to

resign on two separate occasions, by unfairly denying him a certain promotion, and by failing to

honor him with achievement awards.  With respect to his resignation claims, Young testified that

JTEKT unfairly forced him to resign during both of his terms of employment with the company.

The record suggests that, during Young's first term of employment, JTEKT terminated him for

attendance issues.  (Docket No. 94-38 at 38–39; Docket No. 92-18, Ex. 6.)  However, Young

testified at his deposition that he was forced to resign after Bowers, his supervisor, failed to

acknowledge doctors' notes that Young turned in to account for his absences.  (Id. at 43–44.)

With respect to his second term of employment, the record shows that Young resigned after he

returned a positive drug test.  (Docket No. 92-20, Exs. 36, 38.)  In the complaint, Young alleged

that a white employee who had also failed a drug test was not required to resign.  (Docket No. 21

at ¶ 17.)  However, Young later conceded in his deposition that all of the employees who failed

that specific drug test were treated the same, in that everyone lost their jobs.  (Docket No. 94-38

at 149–51.)

With respect to his denial of promotion claim, Young asserted at his deposition that he was unfairly denied a promotion based on his race. The record demonstrates that Young applied for a Kaizen[15] technician position after previously performing work on a Kaizen project. (Docket No. 94-38 at 92.) JTEKT did not offer Young an interview and, instead, gave the Kaizen position to another applicant. (Id. at 90.) In fact, Young testified at his deposition that, upon learning of Young's application for the Kaizen position, his supervisor, Bowers, threatened to terminate his employment. (Id. at 48.) The record suggests that Wilkinson, the human resources manager at the time, ranked the applicants for the position, placing particular weight on seniority, attendance, work history, and knowledge of Kaizen. (Docket No. 94-39 at 41–42.) According to Wilkinson, Young's prior history of poor attendance "[a]bsolutely" played a role in her decision to rank Young lower than other candidates. (Id. at 42.)

Young also alleged in the complaint that JTEKT discriminated against him by failing by recognize him for his "innovative" efforts on the Kaizen project when the company elected to reward two white employees for their efforts on the same project. (Docket No. 21 at ¶ 21.) The defendants take issue with Young's assertion that JTEKT's decision not to reward him was based on his race, referencing the portion of the record demonstrating that Godfrey received three such awards. (Docket No. 94-38 at 181–83.)

### C.    Facts underlying retaliation claim

The plaintiffs assert that the defendants closed the Daleville plant in retaliation for their complaints of racial harassment and discrimination. The record reflects that, around the same time that JTEKT agreed to settle Woolfolk's claims, Hisashige Matt Matsui, president of JTEKT North America, sent an email to JTEKT officials in which Matsui expressed his desire to explore the possibility of closing the Daleville plant: "Please handle this carefully. Last week, we have

---

[15]      "Kaizen" is a Japanese term referring to "philosophy or practices that focus upon continuous improvement of processes in manufacturing, engineering, . . . and business management." (Docket No. 91 at 18 n.5.)

travelled to [JTEKT's plant in Daleville], and I have tried to calculate how big impact we could have from transferring total production from VA to [another JTEKT facility in Tennessee]." (Docket No. 94-6.)  The plaintiffs also assert that, after the Daleville plant closed in 2010, JTEKT moved some of its Daleville employees to the Tennessee facility; however, none of the plaintiffs or other persons who filed racial harassment complaints were offered such opportunities.  The defendants point to the portion of the record which shows that JTEKT officials contemplated closing the Daleville facility due to economic concerns in as early as September 2008.  (Docket No. 92-12 at ¶ 5.)  According to the defendants, the decision to close the plant was conclusively made in early 2009, well before any EEOC charges were filed.  (Id. at ¶ 10.)  Furthermore, the record suggests that the decision to close the Daleville plant was made by JTEKT representatives in Japan who were not familiar with the facts underlying the instant lawsuit.  (Id.)

### D.    Filing of lawsuit and motion for summary judgment

The plaintiffs initiated this lawsuit on November 2, 2009, and filed an amended complaint on June 10, 2010.  In the amended complaint, the plaintiffs advanced five causes of action:  two racial discrimination claims, one under Title VII and one under 42 U.S.C. § 1981; two hostile work environment claims, one under Title VII and one under 42 U.S.C. § 1981; and one retaliation claim under Title VII.  The defendants filed a motion for summary judgment on March 28, 2012.  The plaintiffs filed their brief in opposition to the motion on April 6, 2012, and the defendants filed their reply brief on April 16, 2012.  The court heard oral argument on the motion on May 3, 2012.  The motion is therefore ripe for disposition.

II.    **Discussion**

A.      **Legal standard**

In considering a motion for summary judgment under Federal Rule of Civil Procedure 56, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). The court may grant summary judgment only when, viewing the record as a whole and in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the nonmoving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). For a party's evidence to raise a genuine issue of material fact that avoids summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

B.      **Analysis**

1.      **Hostile work environment claims**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." E.E.O.C. v. Cent. Wholesalers, Inc., 573 F.3d 167, 174 (4th Cir. 2009). To survive summary judgment on a claim of a racially hostile work environment, a plaintiff must demonstrate that a reasonable jury could find that: (1) he experienced unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. Bass v. E.I. DePont de Nemours & Co., 324 F.3d

18

761, 765 (4th Cir. 2003).  The defendants in this case argue that the plaintiffs' hostile work environment claims must fail because the plaintiffs have failed to submit sufficient evidence to prove the third and fourth elements of their claims.  Accordingly, the court will focus its analysis on these elements of the hostile work environment claims.

In determining whether conduct is sufficiently severe or pervasive under the third element, a court must look to the "totality of the circumstances."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); see also id. at 21–22 (stating that the severe or pervasive element includes both a subjective prong and an objective prong).  "Relevant considerations 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Spriggs v. Diamond Auto Glass, 242 F.3d 179,184 (4th Cir. 2001) (quoting Lissau v. S. Food Serv., Inc., 159 F.3d 177, 183 (4th Cir. 1998)).

With respect to the fourth element, an employer's liability for harassing conduct is determined by considering whether the alleged harassment was perpetrated by a supervisor or by a non-supervisory employee.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764–65 (1998).  "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."[16]  Id. at 765.  However, when no tangible employment action is taken, "a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence."  Id.  The defense embraces two elements:  "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing

---

[16]    To determine whether a harassment perpetrator is a supervisor for purposes of vicarious liability, a court must determine whether the perpetrator possesses the "authority to take tangible employment action" against the plaintiff.  Whitten v. Fred's, Inc., 601 F.3d 231, 245 (4th Cir. 2010).  However, such authority is not dispositive in determining whether one is a supervisor; instead, a court must also consult "other features of the employment relations" to determine whether a perpetrator qualifies as a supervisor.  Id.

behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. "While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." Id.; see also Spriggs, 242 F.3d at 187 ("The institution and enforcement of [an anti-harassment policy], in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination." (internal quotation marks omitted)); id. ("However, the mere promulgation of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably." (internal quotation marks omitted)). "And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." Burlington Indus., Inc., 524 U.S. at 765.

When the perpetrator does not qualify as a supervisor, an employer may be liable in negligence under the fourth element if it knew or should have known about the harassment and failed to take effective action to stop it. Ocheltree v. Scollon Prods., 335 F.3d 325, 333–34 (4th Cir. 2003) (en banc). To avoid liability, the employer, after receiving notice of the harassment, must respond with "remedial action reasonably calculated to end the harassment." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008).

20

In applying this case law to the facts in the instant case, the court concludes that, when viewing all of the evidence in the record in a light most favorable to the plaintiffs, there are genuine issues of material fact that preclude a grant of summary judgment as to the hostile work environment claims.  Initially, the court notes that, in analyzing a hostile work environment claim, the court is not limited to considering only the alleged harassment that was directed at the plaintiffs personally; after all, the court is "concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor." Spriggs, 242 F.3d at 184; Hoyle v. Freightliner, LLC, 650 F.3d 321, 333 (4th Cir. 2011) ("[T]he totality of the circumstances includes conduct not directed at the plaintiff."); Ziskie v. Mineta, 547 F.3d 220, 224–25 (4th Cir. 2008) ("Evidence of a general atmosphere of hostility toward those of the plaintiff's [protected class] is considered in the examination of all the circumstances . . . . Even though the plaintiff had not experienced the specific conduct at issue in the customers' testimony, their statements were nonetheless relevant because they supported the plaintiff's claims." (internal quotation marks omitted) (quoting Jennings v. Univ. of N. Carolina, 482 F.3d 686, 696 (4th Cir. 2007) (en banc))).

When viewing all of the evidence in the record, including the evidence submitted in the form of declarations by people other than the plaintiffs, the court concludes that there is a genuine issue of material fact as to whether the plaintiffs have proven that the alleged harassment was sufficiently severe or pervasive.  While the defendants argue in their briefs that the alleged harassment emanated primarily from isolated racist language used by Le, Huynh, and Hashiwada, and from the circumstances surrounding the Balisage taping incident, there is other evidence in the record (including the evidence adduced in the declarations of the people other than the plaintiffs) which suggests that the harassment was more pervasive than the simplistic

21

view adopted by the defendants.  Accordingly, the court concludes that summary judgment is not appropriate with respect to the third element of the hostile work environment claims.  Hoyle, 650 F.3d at 333 ("[T]he question of whether harassment was sufficiently severe or pervasive is 'quintessentially a question of fact.'" (quoting Paroline v. Unisys Corp., 879 F.2d 100, 105 (4th Cir. 1989))).

With respect to the fourth element of the hostile work environment claims—whether there is some basis for imposing liability on the employer—the defendants focus on the fact that, with only two exceptions,[17] the plaintiffs admittedly failed to report any discrimination or harassment concerns to JTEKT's management or human resources department until at least April 2009.  Furthermore, the defendants argue, when the plaintiffs reported the two incidents prior to April 2009, JTEKT responded immediately with remedial action reasonably calculated to end the harassment.  Hence, the defendants contend, there is no basis for imposing liability on JTEKT because it had no notice of the allegedly hostile work environment and, when the company was notified of incidents of harassment, it reacted in a manner reasonably calculated to end the harassment.

Initially, the court notes that the plaintiffs have adduced evidence suggesting that harassment was perpetrated by both nonsupervisory and supervisory personnel at JTEKT, meaning that the two different standards are applicable.  The court will first consider the harassment allegedly perpetrated by nonsupervisory personnel, including the Balisage taping incident, the name-calling by Le and Huynh, and the name-calling of which Campbell spoke in his sworn declaration.  As explained above, the record suggests that the plaintiffs made only two reports of harassment prior to April 2009; furthermore, the record could support a reasonable

---

[17]     The record suggests that, prior to the company's wall-to-wall interviews in April 2009, some of the plaintiffs reported the Balisage taping incident in September 2008 and, furthermore, that Simmons approached Bradley to report Huynh's incessant use of racially derogatory language towards Simmons.

22

jury's determination that JTEKT responded effectively to both of those reports. However, the record also indicates that Campbell, on two occasions, reported the use of racist language to Wilkinson, suggesting that the harassment occurred and was reported sometime prior to September 2008, when JTEKT replaced Wilkinson in its management overhaul. Campbell asserts that, to his knowledge, Wilkinson took no corrective action against the perpetrators. Furthermore, evidence in the record indicates that the management overhaul in September 2008 was prompted by JTEKT's desire to "change [its] culture" as it related to "relationship issues with employees." (Docket No. 94-13.) When viewing the evidence in a light most favorable to the plaintiffs, the court concludes that a reasonable jury could find that the defendants knew or should have known of the racially hostile work environment that allegedly infused the plant and that the defendants failed to take prompt remedial steps reasonably calculated to end the harassment. Hence, because genuine issues of material fact exist, the court will deny the defendants' motion for summary judgment as to the hostile work environment claims relating to the harassment allegedly perpetrated by JTEKT's nonsupervisory personnel.

The court will next consider the harassment allegedly perpetrated by JTEKT's supervisors. The record, when viewed in a light most favorable to the plaintiffs, sets forth numerous examples of supervisory harassment. In his sworn declaration, Campbell stated that unnamed members of management employed racist language and, specifically, that Robbins (a production engineer manager) often employed racist language and jokes. Dowe, in his sworn declaration, stated that he was informed (arguably, by someone who possessed supervisory authority) that he would have to agree to work on Sundays in order to be hired, despite the fact that white employees were treated differently. Furthermore, Dowe stated that he was further treated differently than white employees when, after recovering from a work-related injury, JTEKT refused to allow him to assume light work duties. Craighead, in his sworn declaration,

stated that he became aware of binders in JTEKT's library manifesting racially discriminatory hiring practices by JTEKT supervisors.  Finally, Wilson, in his sworn declaration, stated that Bowers would promote white employees over senior black employees and further stated that Bowers once said that she would "rather have a white guy in charge."  (Docket No. 94-18 at ¶ 7.) Wilson also stated that, upon attempting to complain of Bowers' alleged harassing behavior, a "head m[a]n" informed him that he should drop the complaint or else he "didn't have a job."  (Id. at ¶ 8.)  Young also stated that Bowers exhibited harassing behavior towards him by attempting to sabotage his employment and by threatening to terminate him.

       To the extent that harassment is perpetrated by supervisors, the court recognizes that an affirmative defense is available to employers.  However, the court concludes that, when viewing the evidence in a light most favorable to the plaintiffs, there is a genuine issue of material fact as to whether the defendants are entitled to the affirmative defense.  Based on the evidence in the record, the court concludes that a reasonable jury could determine that, "although [the defendants'] institution of an anti-harassment policy represented a reasonable step toward preventing the type of abuse suffered by [the plaintiffs], the company [acted] unreasonably . . . neglecting to enforce the policy" or by enforcing it in an unfair manner. Spriggs, 242 F.3d at 188; see also id. at 187 ("[T]he 'mere promulgation' of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably." (quoting Brown v. Perry, 184 F.3d 388, 396 (4th Cir. 1999))).  The defendants' "entitlement to the affirmative defense [with respect to the harassment allegedly perpetrated by supervisors] is therefore a triable issue." Id. at 188.

## 2.   Racial discrimination claims

A plaintiff may prove intentional employment discrimination in two ways.  First, "a plaintiff may establish a claim of discrimination through direct or circumstantial evidence that . . . discrimination motivated the employer's adverse employment decision." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004).  "The second method of averting summary judgment is to proceed under a 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." Id. at 285.  The precise formulation of the required prima facie showing will vary in "differing factual situations," McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n.13 (1973), but, fundamentally, the plaintiff must prove that he suffered an adverse employment action "under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

In a typical case, however, a plaintiff establishes a prima facie case by showing:  (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).  If a plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to adduce evidence of a legitimate, nondiscriminatory reason for its actions. Hoyle, 650 F.3d at 336.  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." Burdine, 450 U.S. at 255.  The plaintiff then must show "that the proffered reason was not the true reason for the employment decision," but instead, was a pretext for intentional discrimination. Id. at 256.

25

### a.   Barber

As stated above, Barber asserts that JTEKT discriminated against him by denying him certain promotions and by unfairly demoting him.  As an initial matter, Barber himself effectively concedes that his denial of promotion claim is meritless by admitting that, while the alleged handpicking process affected other people, it did not affect him personally.  (Docket No. 94-37 at 87.)

Barber also brings an unfair demotion claim.  The court notes the existence of a factual dispute, based on Barber's claim that JTEKT denied him the requisite training, regarding whether Barber was performing satisfactorily in his position as AD Line Team Leader.  However, this factual dispute proves immaterial as Barber has failed to carry his burden of proving that he was treated differently than similarly situated nonblack employees—the defendants adduce evidence (which is undisputed by the plaintiffs) that, at the same time that Barber was demoted, another similarly situated white employee, Lee Alcorn, was also demoted for performance-based reasons.  Hence, Barber cannot establish a prima facie case of discrimination.  Coleman, 626 F.3d at 190.  In any event, even if Barber could establish a prima facie case, the defendants have advanced a legitimate, nondiscriminatory reason for his demotion—namely, that he was not performing satisfactorily at the time of his demotion.  Hoyle, 650 F.3d at 336.  Barber has failed to adduce any evidence suggesting that JTEKT's proffered reason is a pretext for discrimination.  Burdine, 450 U.S. at 256.  His claims that he was better qualified than his white replacement are insufficient to show pretext.  See Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 (4th Cir. 2000) ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (internal quotation marks omitted)); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) ("[A plaintiff's]

unsubstantiated allegations and bald assertions concerning h[is] own qualifications . . . fail to disprove [a defendant]'s explanation or show discrimination.").

### b.   Godfrey

Godfrey asserts that JTEKT discriminated against him by denying him certain promotions, despite the fact that management informed him that the promotions would be based on seniority.  To establish a prima facie case of failure to promote based on race, a plaintiff must demonstrate that (1) he belongs to a protected class, (2) he applied for the position in question, (3) he was qualified for the position, and (4) the employer rejected the application under circumstances giving rise to an inference of unlawful discrimination.  Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005).  The evidence in the record shows that Godfrey cannot establish a prima facie case, because the evidence affirmatively suggests that JTEKT's rejection of Godfrey's applications does not give rise to an inference of discrimination.  Not only was one of the positions for which Godfrey applied awarded to Barber, but JTEKT actually offered Godfrey a promotion, which Godfrey declined.  Furthermore, even assuming that Godfrey could establish a prima facie case, the defendants have advanced a legitimate, nondiscriminatory reason for rejecting Godfrey's applications—specifically, that Godfrey lacked sufficient maintenance experience to qualify for the positions.  Godfrey has not produced any evidence indicating that JTEKT's proffered reason is a pretext for discrimination.  Burdine, 450 U.S. at 256.  For these reasons, Godfrey has failed to point to any evidence in the record creating a genuine issue of material fact regarding his discrimination claim.

### c.   Young

Young asserts that JTEKT discriminated against him by forcing him to resign on two separate occasions, by unfairly denying him a promotion, and by failing to honor him with achievement awards.  Young claims that he was unfairly forced to resign at the conclusion of his

first term with JTEKT because Bowers, his supervisor, essentially sabotaged his employment record by failing to acknowledge doctors' notes that Young turned in to account for his absences. However, while there might be a factual dispute regarding the quality of Young's job performance, Young nonetheless cannot establish a prima facie case of discrimination because he has failed to carry his burden of showing that he was treated differently than other similarly situated nonblack employees. Coleman, 626 F.3d at 190.

Although Young also asserts that he was unfairly forced to resign at the conclusion of his second term with JTEKT, he conceded at his deposition that all of the employees who failed the drug test in question were treated the same, in that everyone lost their jobs. (Docket No. 94-38 at 149–51.) Hence, by his own admission, Young cannot establish that he was treated differently than similarly situated white employees. Coleman, 626 F.3d at 190.

Young has also failed to establish a prima facie case of discrimination with respect to his denial of promotion claim. Besides his own self-assessment of his qualifications, Young offers no evidence suggesting that he was qualified for the Kaizen position. The defendants point to evidence in the record suggesting that his prior work history of poor performance rendered him unqualified for the position. See Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 (4th Cir. 2000) ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (internal quotation marks omitted)); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) ("[A plaintiff's] unsubstantiated allegations and bald assertions concerning h[is] own qualifications . . . fail to disprove [a defendant]'s explanation or show discrimination.").

Finally, with respect to Young's claim that JTEKT discriminated against him by failing to honor him with certain performance-related awards, the court notes initially that there is substantial question as to whether failure to receive an award constitutes an adverse employment

28

action. See, e.g., Douglas v. Donovan, 559 F.3d 549, 553 (D.C. Cir. 2009). In any event, Young

produces no evidence that race played any role in JTEKT's decision not to bestow such awards

on him—in fact, the evidence shows that Godfrey and Simmons accumulated at least nine such

awards during their employment with JTEKT. Hence, for the foregoing reasons, Young has

failed to demonstrate the existence of any genuine issues of material fact regarding his

discrimination claims.

### d.    Culture of harassment

The plaintiffs argue in their brief that "a reasonable jury may also find that [the adverse

employment actions taken against the plaintiffs] were informed at least in part by the

overwhelming evidence of racial harassment." (Docket No. 94 at 52.) In essence, the plaintiffs

argue that the atmosphere of harassment that allegedly permeated JTEKT's workplace

demonstrates that the defendants' actions against the plaintiffs were motivated by racial

discrimination. See, e.g., Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300–01 (4th

Cir. 2010) (determining that summary judgment was inappropriate because a "corporate culture"

of discriminatory animus could be attributed to the ultimate decision maker).[18] The court

observes that district courts in this circuit, including this court, have been scrupulous in applying

the Fourth Circuit's "corporate culture" standard as explained in Merritt, only to those cases in

which there is evidence that racial animus pervades all levels of the management environment.

E.g., Alamjamili v. Berglund Chevrolet, Inc., Civil Action No. 7:09-cv-213, 2011 WL 1479101,

at *9 (W.D. Va. Apr. 18, 2011); Young v. United Parcel Serv., Civil Action No. DKC 08-2586,

2011 WL 665321, at *11 (D. Md. Feb. 14, 2011); Burdine v. Greenville Technical Coll., C.A.

---

[18]    In passing, the court notes that, in Merritt, the Fourth Circuit cited the corporate culture of harassment only
as a factor to be considered in determining whether the defendant's legitimate, nondiscriminatory reasons for taking
an adverse employment action were pretextual. Merritt, 601 F.3d at 295. As stated above, the court is of the
opinion that the plaintiffs have failed to establish even prima facie cases of racial discrimination in terms of the
McDonnell Douglas analytical framework.

No. 6:08-cv-03764-JMC, 2010 WL 5211544, at *7 (D.S.C. Dec. 16, 2010). In the court's view, this is not such a case. While there is evidence that the day-to-day working environment was beset with actionable racial overtones, there is no real evidence from which it might be implied that such an atmosphere pervaded the employment decision making process. Indeed, as outlined above, there is evidence to the contrary.

Therefore, because the plaintiffs have failed to carry their burden of demonstrating the existence of a genuine issue of material fact regarding their discrimination claims, the court must grant the defendants' motion for summary judgment with respect to these claims.

### 3. Retaliation claim

The plaintiffs also claim that JTEKT closed the Daleville plant in retaliation for their complaints of harassment and discrimination, in violation of Title VII. Title VII prohibits employers from "discriminat[ing] against any of [their] employees . . . because [the employees] ha[ve] opposed any practice made an unlawful employment practice by [Title VII], or because [the employees] ha[ve] . . . participated in any manner in an investigation" under Title VII. 42 U.S.C. § 2000e-3(a). The elements of a retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action. Coleman, 626 F.3d at 190. If a plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its decision. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir. 1998). The burden then shifts back to the plaintiff to rebut the defendant's proffered reason. Id.

After reviewing the evidence in the record, the court concludes that there is a genuine issue of material fact regarding whether the plaintiffs have shown that a causal link exists between the plaintiffs' protected activity (reporting instances of racial harassment and

30

discrimination)[19] and JTEKT's decision to close the Daleville plant. The record shows that, around the end of April 2009, the president of JTEKT North America sent an email asking other JTEKT officials to explore the possibility of closing the Daleville office. This email was sent after the Balisage taping incident, after Simmons had complained of Huynh's harassing behavior, and after the Woolfolk notes and noose discovery. Furthermore, the email was sent around the same time, albeit slightly before, JTEKT agreed to settle Woolfolk's claim and JTEKT officials interviewed the plaintiffs to unearth many of the complaints of racial harassment and discrimination that are at issue in this suit. While the court recognizes that other evidence in the record might suggest that the decision to close the Daleville plant had its genesis in September 2008 for economic reasons, the court concludes that a reasonable jury could find that a causal link existed between JTEKT's decision to close the plant and the plaintiffs' protected activity.[20] Furthermore, although JTEKT has advanced a legitimate, nonretaliatory reason for taking the adverse employment action, the court likewise concludes that, based on the timing of the email sent by officials from JTEKT North America regarding the possible closure of the Daleville plant, a reasonable jury could determine that JTEKT's proffered reason was pretextual. Hence, because genuine issues of material fact exist, the court will deny the defendants' motion for summary judgment as to the plaintiffs' retaliation claim.[21]

---

[19]     The defendants confine their view of the protected activity to the plaintiffs' decision to file the EEOC charges. However, the case law demonstrates that an employee's complaint (whether a formal EEOC complaint or a less formal verbal or written complaint to management) "constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct." Burgess v. Brown, No. 10-2081, 2012 WL 517190, at *9 (4th Cir. Feb. 17, 2012) (citing Richardson v. Richland Cnty. Sch. Dist. No. 1, 52 F. App'x 615, 617 (4th Cir. 2002)).

[20]     The court recognizes that a reasonable jury could determine that the defendants elected to close the plant in response to complaints of harassment by people other than the plaintiffs; however, this factual finding would not prove fatal to the plaintiffs' retaliation claim because the plaintiffs fall within the zone of interests protected by Title VII. Thompson v. N. Am. Stainless, LP, 131 S. Ct. 863, 870 (2011).

[21]     However, the court will grant the defendants' motion for summary judgment as to plaintiff Young's retaliation claim because Young has failed to establish a prima facie case. Because Young admittedly resigned his employment with JTEKT on January 20, 2009, several months before the JTEKT North America officials sent the email regarding the possible closure of the Daleville facility, it is dubious whether Young can establish a causal link between any protected activity and JTEKT's decision to close the plant. As discussed above, Young concedes that

### III.    Conclusion

For the reasons set forth above, the court will grant in part and deny in part the defendants' motion for summary judgment.  Specifically, the court will grant the motion with respect to the plaintiffs' discrimination claims, and will deny the motion with respect to the plaintiffs' hostile work environment claims.  Furthermore, the court will grant the defendants' motion with respect to Young's retaliation claim, but will deny the motion with respect to the remaining three plaintiffs' retaliation claims.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

**ENTER**: This ___4ᵗʰ___ day of May, 2012.

_____
Chief United States District Judge

---

he was properly forced to resign based on his positive drug test.  In any event, the court concludes that Young has failed to establish that he suffered an adverse employment action, as he had resigned his employment long before the closure of the Daleville plant and, thus, was not affected by JTEKT's decision to close the facility.